AO 91 (Rev. 11/11) Criminal Complaint

# UNITED STATES DISTRICT COURT
## for the
### Eastern District of North Carolina

FILED
MAY 01 2025
PETER A. MOORE, JR., CLERK
US DISTRICT COURT, EDNC
BY ___BRH___ DEP CLK

United States of America
v.

**Miguel Duran Duran and Paola Duran Duran**

*Defendant(s)*

Case No. 5:25-mj-1559-JG

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.
On or about the date(s) of __April 28, 2025__ in the county of __Wake__ in the __Eastern__ District of __North Carolina__, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. §§ 1201 and 2 | Kidnapping and Aiding and Abetting |

This criminal complaint is based on these facts:

See attached

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Shaylin Laure, FBI Special Agent
*Printed name and title*

Attested to by the complainant in accordance with the requirements of Fed. R. Crim. P. 4.1 by __telephone__ *(specify reliable electronic means)*.

Date: 1 MAY 2025
9:46 AM

City and state: Raleigh, North Carolina

_____
*Judge's signature*

James E. Gates, United States Magistrate Judge
*Printed name and title*

# AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT

Shaylin Laure, Special Agent (SA), Federal Bureau of Investigation (FBI), Charlotte Division (CE), Raleigh-Durham Resident Agency, Cary, NC, being duly sworn, states the following:

## Affiant Background

1. I am a Special Agent for the Department of Justice, Federal Bureau of Investigation (DOJ/FBI), and have been so employed since July 7, 2019. Thus, I am a "Federal Law Enforcement Officer" within the meaning of Federal Rules of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General. As such, I am empowered to conduct investigations of, and to make arrests for, violations of federal law.

2. I am currently assigned to the Raleigh/Durham Safe Streets Task Force (RDSSTF) of the Charlotte field office. As part of my duties, I am responsible for the investigation of violations of Federal laws, including those pertaining to violent street gangs and distribution of controlled substances. Prior to my employment with the FBI, I worked as a deputy for the Kent County Sheriff's Office in Grand Rapids, Michigan from 2014 through 2019. Since December 6, 2019, I have conducted and participated in federal investigations involving physical surveillance, the execution of search warrants, and the execution of arrest warrants. These investigations have led to multiple arrests of individuals involved in trafficking of controlled substances, firearms violations, and criminal street gangs in Durham, North Carolina.

1

Case 5:25-mj-01559-JG    Document 1    Filed 05/01/25    Page 2 of 17

3. This Affidavit contains information necessary to support probable cause for the Criminal Complaint. The information contained in this Affidavit is based on my personal participation in the investigation of the case and from information provided to me by other Special Agents and Task Force Officers, as well as other federal, state, and local law enforcement officers. Since this Affidavit is being submitted for the limited purpose of establishing probable cause for the issuance of a Criminal Complaint, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts which I believe are necessary to establish the requisite foundation for probable cause.

## INTRODUCTION

4. This affidavit is made in support of a complaint against PAOLA DURAN DURAN (hereinafter "Paola") and MIGUEL DURAN DURAN (hereinafter "Miguel"), charging each defendant with kidnapping, in violation of Title 18, United States Code, Section 1201.

## FACTS ESTABLISHING PROBABLE CAUSE

5. On April 28, 2025, at approximately 10:53pm, Garner Police Department was dispatched to a residence in Garner, North Carolina, in reference to a reported kidnapping. The adult male resident, Victim-1, reported that his wife and 13-month-old child (hereinafter "Victim-2" and "Victim-3" or "the baby", respectively) were kidnapped.

AJA

6. Victim-1 reported noticing a black in color Nissan Altima drive by the family's residence multiple times while unloading groceries that evening. The family went inside for approximately five to ten minutes before they heard a knock on the door. Victim-1 reported that a female was at the door and asked for "Maria." The unknown female and two additional male suspects then forced their way into the home. One male suspect was armed with a black in color semi-automatic handgun. The male suspects were wearing ski masks.

7. Victim-1 said that the male suspects threw him to the ground, taped his hands behind his back, and taped over his mouth and eyes. Victim-1 advised he was struggling with the suspects, and that they said something to the effect of, "No one will be hurt. Stop fighting." Victim-1 noted that the suspects knew his name and the nickname of a family member. Victim-1 said that his wife, Victim-2, did not want to give up the baby. Victim-1 heard the female suspect telling Victim-2 to calm down.

8. Victim-1 said that the female suspect and one male suspect took Victim-2 and the baby out the back door. The other male suspect stayed behind and told Victim-1 not to call the police. He told Victim-1, "The man they work for wants one million dollars." This same male suspect told Victim-1 that he would be called the following day at 5:00pm. Victim-1 recalled the suspects mentioning a "safe house." The suspect threatened to have someone go to Victim-1's family's house as well.

9. Victim-1 then asked to be moved to the couch, and a suspect picked Victim-1 up and moved him. The suspect slightly cut the tape binding Victim-1 so that Victim-

AJA

1 would be able to free himself. Victim-1 believed the last suspect was picked up by a vehicle and left.

10. Law enforcement reviewed in-home surveillance from the victim family's residence. Relevant video with a date/time stamp of 4/28/2025 at approximately 07:48 showed a vehicle pulling into the residence driveway. At 07:49, the female suspect knocked on the door of the residence. The video showed two additional suspects then approach the residence from the same vehicle. One male suspect is seen forcing his way inside the home; the other two suspects follow.

11. At time stamp 08:04, the video shows one male suspect holding Victim-2 and escorting her outside, and the female suspect carrying the baby.

12. The surveillance video shows (time stamped 4/28/2025 at approximately 08:08) the female suspect carrying the baby reapproach the front door and go inside briefly. The female suspect returns to the driveway.

13. At approximately 08:16, a male suspect wearing a ski mask and holding what appears to be a gun in his left hand exited the house, jogged to a vehicle, got into the vehicle, and drove away.

14. Your affiant compared the time stamps on the video with the current time and the time from the 911 call, and it appears that the video time is approximately 2 hours and 29 minutes off. Therefore, it is believed the suspects arrived at the house around 10:18pm and left with Victim-2 and the baby at approximately 10:33pm.

4

AJA

15. The suspect vehicle seen on the surveillance video is consistent with a dark in color Nissan Altima. The last suspect can be seen leaving the residence at 10:45pm, carrying what appears to be a handgun and getting into the Nissan.

16. Victim-1 was able to free himself from the tape and run to the window, where he saw the suspect vehicle driving away. He called his father then called 911. Victim-1 was transported to Garner Police Department and interviewed, where he provided the following information:

   a. The suspect vehicle appeared to be a black in color Nissan Altima with blue after-market headlights. Victim-1 had seen the black Nissan Altima drive by his house while he unloaded groceries in his driveway. Victim-1 took a load of groceries into the house and then returned back to his car in the driveway, at which time he saw the black Nissan Altima drive by his house a second time, but in the opposite direction. Victim-1 noticed the vehicle because it was odd that it was driving by a second time. He observed that the vehicle had a generic North Carolina license plate.

   b. Victim-1 went back into the house. Shortly after, he heard a knock on the front door. Victim-1 cracked the door and saw a Hispanic woman at his door who asked for "Maria." Victim-1 was distracted by his daughter, Victim-3, when he told the woman that no one by the name of "Maria" was at that address. Two males then got out of the back seat of the black Nissan Altima and rushed into the house. Victim-1 described the female suspect as a

AJA

Hispanic woman around 25 years old wearing a dark in color zip-up hooded sweatshirt and jeans.

c. One of the males rushed at Victim-1 and tackled him to the ground. The male duct taped Victim-1's hands behind his back and then covered his eyes and mouth with duct tape. The male held a gun at to the back of Victim-1's head. Victim-1 provided a description of this suspect, which was not Paola or Miguel.

d. Victim-1 could not see anything the rest of the time the suspects were in the house and he did not have a description of the second male suspect (who was later identified as Miguel. He heard the female suspect telling Victim-2 to calm down and instructing Victim-2 to tell him to calm down. Victim-1 believed the female suspect was on the couch with Victim-2 and Victim-3 during this time. A few minutes after the suspects entered the house, Victim-1 heard the female suspect and one of the male suspects, Miguel, go outside with his wife and daughter. Shortly after they went outside, Victim-1 heard what sounded like a car leave outside.

e. Approximately three to four minutes later, the other male suspect, stepped outside to talk on the phone and said in Spanish, "Let me know when you're at a good distance." Victim-1 believed this was an incoming call based on how the suspect started speaking, but he did not hear the phone ring. The suspect then came back into the residence where Victim-1 was still on the floor and bound by duct tape. Victim-1 asked to be moved

6

to the couch through the duct tape on his mouth and the suspect lifted him onto the couch. The suspect then took a knife and slightly cut the duct tape on Victim-1's wrists, informing Victim-1 that the knife would be on the couch next to him in case he needed it. The suspect left and Victim-1 was able to get the duct tape off his wrists, eyes, and mouth. After he did so, he observed a knife on the couch next to him with a napkin wrapped around the handle.

17. Victim-1 recalled the male suspects spoke broken English with a Mexican accent. When they spoke in Spanish, they used phrases common to Mexico. Victim-1 is Mexican American and speaks fluent Spanish.

18. Victim-1 positively identified Paola as the female suspect with 90% certainty based off a photograph shown to him by investigators.

19. Law enforcement reviewed license plate recognition cameras in the area of where the kidnapping occurred. Law enforcement searched for a black Nissan Altima and located one with a visible NC registration. This vehicle was seen on cameras at Forest Ridge and Spring Dr. on 4/28/2025 at 8:37pm.

20. Law enforcement identified an address in Raleigh, North Carolina as an address for the registered owner of this vehicle. Agents with the RDSSTF responded to said Raleigh address and located the black Nissan Altima backed into the residence.

21. While agents were speaking with the occupant of the residence, they observed, in plain view, duct tape on the driver's side floorboard of the Nissan Altima

which was parked near the trailer. Agents saw two pairs of surgical gloves: one on the floor and one on the passenger seat, which appeared used. The vehicle was unlocked, and the keys were in the cup holder. All items were in plain view from outside the vehicle.

22. At approximately 6:50am, Victim-1's mother received a phone call while at the Garner Police Department. She answered the phone and someone claiming to be Victim-2 told her she needed to speak with Victim-1. Victim-1 then received several phone calls from the same phone number. Victim-1 answered one of the phone calls and spoke to a male who identified himself. The caller stated that Victim-2 and Victim-3 were at the caller's address in Wake Forest, North Carolina and that they were safe. He told Victim-1 that Victim-2 knocked on his door and asked for help. Law enforcement responded to the Wake Forest address and recovered Victim-2 and Victim-3.

23. A doorbell ring camera of a residence located across the street from the Raleigh address at which police located the Altima captured images of the black Nissan Altima suspected in the kidnapping, along with an unknown red pickup truck and a red Chevy Equinox. At approximately 10:56pm on April 28, 2025, the black Nissan Altima arrived at the Raleigh residence. An adult holding a small child is visible getting out of the Nissan Altima and into a red pickup truck. Other individuals are seen moving from the Altima to the pickup truck as well, but headlights made it difficult to discern size and gender. One individual went into the trailer at the Raleigh address and just seconds later ran back out of the trailer and got into the Chevy

8

Equinox. The pickup truck then pulled away from the residence and the Equinox followed. License Plate Reader ("LPR") cameras captured the red Chevy Equinox leaving the area.

24. The registered owner of the vehicles responded to the Raleigh address where he spoke with investigators on scene. The registered owner stated that the vehicles (both the Altima and the Equinox) are registered in his name, but he leaves them at that address for his wife to have access to. He and his wife, Paola, are separated. Paola had full access to both the Nissan Altima and the Chevy Equinox.

25. On April 29, 2025, the red Chevy Equinox was located at a business in South Raleigh. Investigators observed Miguel access the vehicle while conducting physical surveillance on the car. Miguel is the brother of Paola. Investigators approached Miguel and requested consent to search the Equinox, and he consented. Miguel then agreed to go back to Garner Police Department to be interviewed.

26. Miguel was read his Miranda rights in Spanish due to his somewhat limited English-speaking ability. He stated that he understood his rights and agreed to speak with law enforcement. Miguel was able to conduct the interview partially in English and partially in Spanish. During his interview, Miguel provided the following information:

    a. Miguel knew someone who he referred to as "Leo" from working for a plumbing company a few years prior. Miguel's sister, Paola, also worked for the same plumbing company and knew Leo. Miguel only worked at the

9

plumbing company for a few months because he did not get along with Leo and did not want to work with Leo.

b. The Saturday prior, April 26, 2025, Miguel reached out to Leo and asked if he could do any jobs to make $200 because he didn't have any money. Miguel reached out to Leo via the messaging platform WhatsApp. Miguel consented to investigators searching his phone and showed investigators the message.

c. On April 28, 2025, Leo showed up at Miguel's house, a meeting which had been arranged by Paola. Leo told Miguel and Paola that they could make $100,000 if they helped him with this job, to which they agreed. Miguel and Paola were told they were going to break into someone's house who owed a drug debt and threaten them to pay the debt. No one else was supposed to be in the house other than the guy who owed the money. They both agreed to help Leo with the job for $100,000.

d. Paola, Miguel, and Leo went the victim family's residence in Garner, North Carolina in a car. Paola went up to the door first, and then Miguel and Leo rushed into the house. Leo had a handgun and rushed at the male they were there to intimidate (Victim-1), but a woman and a baby were also inside the residence.

e. According to Miguel, Leo was calling the shots. He instructed Paola and Miguel to take the woman and the child outside, which they did. A short time later, Leo came outside, and they all drove away in the car together.

10

They arrived back at the Raleigh residence (where law enforcement later found the parked Altima), where Miguel, Leo, and the two victims moved to a pickup truck that had been parked at the residence. Miguel believed the pickup truck belonged to Leo. Paola moved to the Equinox that had been parked at the residence. Leo then drove the truck up to Wake Forest while Miguel sat in the backseat with the victims, and Paola followed them in the Equinox.

f. Approximately thirty minutes later, they all arrived at a house in the Wake Forest area. Miguel did not know the address but explained that it was a trailer that was partially furnished. It did not look like anyone lived in the trailer. Leo took them to the trailer, but Miguel stated that he had never been there before. They took the victims into the trailer and Leo instructed Paola to help Victim-2 bathe, in order to wash any evidence off her skin and clothes. While Paola did this, Miguel held the baby.

g. After they finished bathing Victim-2, they saw an Amber Alert come out for Victim-2 and Victim-3. This scared them, so they drove about 15 minutes away from the trailer and dropped Victim-2 and Victim-3 off on a dirt road before driving away.

h. After dropping off the victims, Leo went in his truck and Miguel rode with Paola in the Equinox to their uncle's house, located in Fuquay-Varina, North Carolina. There, Miguel changed clothes and then he took the Equinox to the South Raleigh business.

11

i. At the conclusion of the interview, Miguel was shown a photograph of who investigators believed to be the third suspect. Miguel positively identified a photograph of the third suspect. Miguel also provided consent to search his phone, along with the passcode to enter the phone.

27. On April 29, 2025, at approximately 1:25pm, Paola was located at the Raleigh residence at which the Altima had been located and was taken into custody. Paola was transported to Garner Police Department and interviewed, where she was read her Miranda rights in Spanish due to speaking limited English. Initially, through an interpreter, Paola denied any knowledge or involvement in anything the previous day and then requested an attorney. An agent videoed her brother, Miguel, providing encouragement to Paola to cooperate and the video was played for Paola. Paola then began to cry. She stated that she wanted to speak with investigators and investigators reminded her about her Miranda rights and clarified if she would like an attorney. Paola explicitly waived her right to have an attorney present and said she wanted to speak to investigators at that time. She then provided the following information:

   a. Paola met a male who she referred to as "Rafael" working for a plumbing company. She worked for the company up until about three months ago. When she stopped working for the company, Rafael was still working there, but she was unsure if he still worked there at the time of the interview.

   b. Rafael reached out to Paola and asked her if she and her brother, Miguel, wanted to make $100,000 over four days. Paola said yes and Rafael

12

explained that he works for someone who was coordinating people to break into locations to intimidate people into paying their drug debts. Paola never had contact with the boss, she only knew what Rafael told her about the job.

c. Rafael told Paola that only the male who they were being sent to intimidate (Victim-1) would be at the residence, no one else was supposed to be home. Rafael had a gun, but Paola and Miguel did not. Initially they drove by the house to make sure the male (Victim-1) was going to be home, and they saw him in the driveway. They drove by the house a second time to ensure Victim-1 went into the house. Once they were sure he was in the house, they pulled into the driveway and Paola went to the door. Paola knocked on the door and Victim-1 answered. Paola asked Victim-1 if "Maria" was there, and when Victim-1 cracked the door open, Paola saw Victim-2 and Victim-3 inside the residence.

d. Rafael and Miguel pushed past Paola and into the house to deal with Victim-1 as planned. Rafael told Paola to get Victim-2 and Victim-3 onto the couch. A short time later, Rafael instructed Miguel and Paola to take Victim-2 and Victim-3 outside because things didn't go as planned (referring to Victim-2 and Victim-3 being present at home when it was only supposed to be Victim-1). A few minutes later, Rafael came out of the house and they all drove away in the car.

13

Case 5:25-mj-01559-JG    Document 1    Filed 05/01/25    Page 14 of 17

e. They returned to the Raleigh residence at which the Altima was found and switched vehicles prior to driving up to the Wake Forest area. Paola remembered driving north to another trailer that was located in a trailer park. Once inside, Rafael instructed Paola to bathe Victim-2 to get rid of any evidence. Paola helped Victim-2 wash up while Miguel held the baby. Paola believed Rafael talked to the boss on the phone during this time. Paola could not determine at what time Rafael left the trailer but stated that he returned to the trailer around 5am on April 29, 2025.

f. In the early hours of April 29, 2025, the suspects saw the Amber Alert come out for Victim-2 and Victim-3, which spooked them, so they decided to release the victims. All three suspects were present at the trailer when they loaded the victims into the trucks and drove to someplace where two dirt roads met in a 'T' intersection. They dropped Victim-2 and Victim-3 off on a dead-end dirt road surrounded by woods. Miguel and Paola then went to their uncle's house in the Equinox. After that, Miguel dropped Paola off at her friend's house in Durham and later that day, Paola's friend dropped her back off at the Raleigh residence where she was taken into custody.

g. At the conclusion of the interview, investigators showed Paola a photograph of the third suspect, and Paola positively identified him as the man she was referring to as "Rafael."

28. During the course of the aforementioned kidnapping, Miguel, Paola and the third suspect used instrumentalities of interstate commerce. Specifically, the

suspects utilized a particular Nissan Altima, which was manufactured in Mississippi.[1] Additionally, the suspects used cell phones to communicate with one another before and during the events described. Both vehicles and cell phones are instrumentalities of interstate commerce, even when used intrastate.[2]

## CONCLUSION

29. Based on the forgoing facts, I respectfully submit that there is probable cause to believe that on or about April 28, 2025, in Wake County, Miguel Duran Duran and Paola Duran Duran, did knowingly commit the act of kidnapping in violation of Title 18, United States Code, Section 1201.

## REQUEST FOR SEALING

This investigation is ongoing and is expected to be ongoing following the execution of the instant warrant. Therefore, IT IS FURTHER REQUESTED that the warrant, supporting application, affidavit, and associated pleadings be filed UNDER

---

[1] Per https://vpic.nhtsa.dot.gov/decoder/.

[2] 2 *See, e.g., United States v. Cobb,* 144 F.3d 319, 322 (4th Cir. 1998) (holding that "[c]ars, like trains and aircraft" are instrumentalities of interstate commerce because they are "inherently mobile and indispensable to the interstate movement of persons and goods"); *United States v. Windham*, 53 F.4th 1006, 1013 (6th Cir. 2022) ("The issue is therefore whether cars and cell phones are instrumentalities of interstate commerce, not whether they were used interstate. This Court has held repeatedly and unambiguously that cars and phones are instrumentalities of interstate commerce."); *Autry v. United States*, No. 7:20-CR-00023-M-3, 2023 WL 6627805, at *2 (E.D.N.C. Oct. 11, 2023) (Myers, CJ) (To start, Petitioner's jurisdictional argument is negated by the express terms of the federal kidnapping statute, which covers offenses in which individuals "use[ ] ... any ... instrumentality of interstate ... commerce in committing or in furtherance of the commission of the offense." 18 U.S.C. § 1201(a)(1). . . . Use of a cellular phone constitutes use of an instrumentality of interstate commerce.").

15

Case 5:25-mj-01559-JG   Document 1   Filed 05/01/25   Page 16 of 17

SEAL until further order of the Court to avoid premature disclosure of the ongoing investigation, guard against flight, avoid the destruction of evidence, avoid the intimidation of witnesses, and better ensure the safety of agents and others, except that copies may be provided to law enforcement officers of the FBI, federally deputized state and local law enforcement officers, and other government and contract personnel acting under the supervision of such investigative or law enforcement officers, as necessary to effectuate the Court's Orders.

Respectfully Submitted,

Shaylin Laure
Special Agent
Federal Bureau of Investigation

Dated: May \_\_1\_\_ 2025

Pursuant to Rule 4.1 of the Federal Rules of Criminal Procedure, the affiant appeared before me via reliable electronic means (telephone), was placed under oath, and attested to the contents of this written affidavit.

JAMES E. GATES
United States Magistrate Judge
Eastern District of North Carolina